IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

JEFFREY D. ARP                    )
                                  )
v.                                )    No. 2:05-0023
                                  )    Judge Wiseman/Brown
JO ANNE B. BARNHART, Commissioner )
of Social Security                )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C.
§405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits (DIB) and supplemental security income (SSI),
as provided under Titles II and XVI of the Social Security Act,
as amended.  The case is currently pending on plaintiff's motion
for judgment on the administrative record (Docket Entry No. 10),
to which defendant has responded (Docket Entry No. 18).  For the
reasons stated below, the Magistrate Judge recommends that
plaintiff's motion for judgment be GRANTED, and that the decision
of the Commissioner be REVERSED and the cause REMANDED for
further administrative proceedings, to include updating the
medical record and rehearing.

## I.  INTRODUCTION

Plaintiff filed his applications for SSI and DIB on

1

October 11, 2001 and November 26, 2001, respectively (Tr. 18).

Plaintiff alleges disability since January 1, 2001, due to leg

problems, chondromalacia patella, and arthritis (Tr. 84). After

denial of these applications at the initial and reconsideration

stages of agency review (Tr. 45-55), plaintiff requested a

hearing before an Administrative Law Judge (ALJ). This hearing

was held on March 4, 2004 (Tr. 566-595). On August 24, 2004, the

ALJ issued a written decision denying plaintiff's claims for

benefits (Tr. 18-36). The ALJ made the following findings:

1.   The claimant meets the nondisability requirements for a
     period of disability and Disability Insurance Benefits
     set forth in Section 216(I) of the Social Security Act
     and is insured for benefits through the date of this
     decision.

2.   The claimant has not engaged in substantial gainful
     activity since the alleged onset of disability.

3.   The claimant's knee disorder and osteoarthritis and
     allied disorders are considered "severe" based on the
     requirements in the Regulations 20 CFR §§ 404.1520(c)
     and 416.920(b).

4.   These medically determinable impairments do not meet or
     medically equal, singly or in combination, the severity
     of any one of the listed impairments in Appendix 1,
     Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations
     regarding his limitations are not totally credible for
     the reasons set forth in the body of the decision.

6.   The claimant retains the residual functional capacity
     for a wide range[1] of light exertional work. He is able

_____

[1] While the range of light work which plaintiff was found capable of
performing is characterized here as "wide," the ALJ's narrative report
characterizes it alternately as "narrow" and "wide" (Tr. 30, 31, 33, 35).
However, consistent with the VE's testimony to a "limited" range of such work

2

to lift/carry 20 pounds occasionally and 10 pounds frequently; he can stand/walk for 2 hours in an 8 hour work day; however, he requires a sit/stand option. He has significant non-exertional limitations which further reduce his residual functional capacity. Because of significant pain/discomfort, he is unable to use his upper extremities for continuous or repetitive activities.

7. The claimant is unable to perform any of his past relevant work (Vocational expert)(20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10. Transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. Given his age, education, past work experience, residual functional capacity assessment and vocational expert testimony, there are a number of other jobs that exist in significant numbers in the local and national economy that the claimant can perform. The framework of Rule 202.21 of the Medical-Vocational Guidelines also supports a conclusion that there are a significant number of jobs in the national economy that he could perform.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 35-6).

On February 18, 2005, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr. 7-

---

within plaintiff's RFC (Tr. 591-92), it is assumed that the ALJ in fact intended to find plaintiff to be limited to a narrow range of light work.

9), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. REVIEW OF THE RECORD

Plaintiff is a 36-year old man with a high school education (Tr. 570). He has past relevant work as an electrician, a maintenance mechanic, a cook, an auto mechanic, a die press operator, a material handler, a delivery truck driver, a groundskeeper, an assembler, an interviewer, and a certified nursing assistant (Tr. 588-589).

Plaintiff has a history of knee problems requiring arthroscopy (Tr. 151). In June 1998, he underwent chondroplasty and drilling of defect to repair an osteochondral fracture (Tr. 153). The orthopedic specialist who followed plaintiff's progress after surgery felt that he would need knee replacement surgery eventually, but hoped that this could be postponed for many years (Tr. 232).

Plaintiff developed bilateral pain and tingling in his hands as well as some neck pain in 1999 (Tr. 260, 272, 513). An MRI of the cervical spine in March 1999 showed mild spondylosis

4

with mild left neuroforaminal narrowing at C4-5 and mild right neuroforaminal narrowing at C5-6, both related to mild disk bulge and accompanying osteophyte (Tr. 268-69). EMG studies were essentially normal (Tr. 214, 518-519). Plaintiff's problems continued despite conservative treatment. He had carpal tunnel release surgery on his right hand in November 1999 and on his left hand in January 2000 (Tr. 181-182, 272, 513-517).

Dr. Douglas Weikert, an orthopedic surgeon, performed an independent medical evaluation in June 2000 (Tr. 270). Plaintiff reported an improvement in the numbness and tingling but had residual discomfort (Tr. 270). Dr. Weikert felt that plaintiff's problems were caused by an overuse syndrome, not by nerve compression (Tr. 451). He did not recommend any permanent work restrictions (Tr. 456). Dr. David Gaw, an orthopedic surgeon, also performed an independent medical evaluation in June 2000 (Tr. 387). Plaintiff still had some grip weakness as well as aching and soreness (Tr. 388). Dr. Gaw opined that plaintiff should avoid continuous twisting or gripping (Tr. 391). He noted that some people had permanent loss of grip strength after this type of surgery (Tr. 392).

Dr. Tom Jenkins saw plaintiff in August 2001 with complaints of diffuse pain (Tr. 190-192). He prescribed Naprosyn and recommended a rheumatology consult (Tr. 188, 192). Dr. Jenkins ordered an MRI of the right knee to investigate

5

continuing complaints of knee pain (Tr. 185). The right knee MRI in October 2001 showed a small amount of fluid within the joint with increased signal within the patellar facet cartilage consistent with chondromalacia patella and a small Baker's cyst posterior medial aspect (Tr. 213). Dr. John Thompson, an orthopedic surgeon, performed arthroscopy and chondroplasty of the distal patellofemoral and medial compartment of the right knee (Tr. 174).

Dr. John Turnbull, an orthopedic surgeon, saw plaintiff in December 2001 for continuing problems with his right knee (Tr. 229-230). Dr. Turnbull's assessment was symptomatic mild degenerative arthritis in the right knee (Tr. 229). He ordered physical therapy and a knee brace. Dr. Turnbull noted some mottling and disparity of temperature of the legs (Tr. 229). In January 2002, plaintiff reported knee and bilateral shoulder pain (Tr. 228). He was walking with a crutch, and Dr. Turnbull recommended that he try to move to a cane instead. Dr. Turnbull gave plaintiff the first in a series of three Synvisc injections in his knee (Tr. 228). At the time of his third injection in February 2002, plaintiff described radicular symptoms in addition to knee complaints (Tr. 226).

Dr. Howard Fuchs, a rheumatologist, evaluated plaintiff in January 2002 for chronic generalized pain (Tr. 240). He prescribed Prednisone and ordered tests. When plaintiff returned

6

in February, he reported no benefit from the Prednisone (Tr. 239). Dr. Fuchs stated that this made it unlikely that he had rheumatoid disease. He prescribed Voltaren (Tr. 239).

When he saw Dr. Jenkins later in February 2002, plaintiff had continuing joint pain (Tr. 285). Dr. Jenkins discontinued Voltaren and prescribed Neurontin (Tr. 285, 290). In March 2002, plaintiff was sleeping better, and his pain was minimally better (Tr. 284). Dr. Jenkins increased Neurontin.

Plaintiff saw Dr. Turnbull again in April 2002 with continuing problems with his right knee (Tr. 274). The Synvisc injections had not provided any relief. Dr. Turnbull reviewed the x-rays; he noted some arthritic changes, but did not recommend total knee replacement for such a young patient. Dr. Turnbull could not offer further treatment and recommended a pain clinic (Tr. 274).

Dr. Jenkins saw plaintiff in April 2002 and July 2002 with left knee pain, as well as neck and low back pain (Tr. 279-282). He prescribed Neurontin and Nortriptyline and made a referral to a pain clinic (Tr. 280). Dr. Winston Griner, a pain specialist, administered trigger point injections in August 2002 (Tr. 353). In September 2002, Dr. Jenkins referred plaintiff to an orthopedic surgeon for continuing complaints of left knee pain (Tr. 277-278). He prescribed Darvocet (Tr. 277).

An MRI of the left knee in September 2002 revealed

7

degenerative changes in the posterior horn of the medial meniscus and a small radial tear along the inner margin of the posterior horn of the medial meniscus (Tr. 381). There was mild degenerative arthritis with thinning of the articular cartilage, a Baker's cyst in the posterior medial popliteal fossa, and small joint effusion primarily within the patellofemoral joint (Tr. 286). In October 2002, Dr. Thompson performed arthroscopy with a partial medial meniscectomy and chondroplasty of the medial femoral condyle of the left knee (Tr. 379).

Dr. Jenkins continued to follow plaintiff's progress. In February 2003, plaintiff reported that both knees were painful (Tr. 295). Dr. Jenkins continued his medications: Darvocet, Neurontin, Aspirin, Aristocort, and Nortriptyline (Tr. 296-297). In June 2003, plaintiff had pain and a limited range of motion in his neck with diffuse tenderness over his entire back (Tr. 293). Dr. Jenkins noted an area of diminished skin sensation from the metatarsal heads distally in the right foot. He prescribed the same medications and added Zyban for smoking cessation. His diagnoses were pain in joint, myalgia and myositis, tobacco abuse, and chronic bronchitis (Tr. 293).

Dr. P. K. Jain saw plaintiff in September 2003 for persistent pain in all joints (Tr. 346). Dr. Jain observed that plaintiff was restless and walked with a slow, limping, cautious, stiff, unsteady gait. Neurological testing revealed 3/5 strength

8

in the flexors and extensors of both hands (Tr. 347).  Dr. Jain's
diagnoses included insomnia, chondromalacia, lumbosacral neuritis
or radiculitis, osteoarthritis, depression, neuropathy, and
hypertension.  He prescribed Nortriptyline, Voltaren, Parafon
Forte, Wellbutrin, and Neurontin and ordered labs (Tr. 347).
Chest x-rays showed increased AP diameter with increased
bronchial markings in both lung fields (Tr. 304).  In October
2003, breathing capacity testing showed moderate obstructive
pulmonary disease with small airway disease (Tr. 324).  Thoracic
bioimpedance testing showed increasing vascular resistance (Tr.
307).  Dr. Jain's diagnoses included chronic pulmonary heart
disease and arthralgia; he prescribed Advair Diskus, Combivent,
Uniphyl, and Diovan (Tr. 323).  In November 2003, plaintiff
reported difficulty breathing for about a year (Tr. 308).  An
arthritis panel was within normal limits.  Dr. Jain prescribed a
cane for arthralgia (Tr. 322).

In December 2003, Dr. Jain examined plaintiff and
completed a medical assessment (Tr. 299-301, 305-306). He opined
that plaintiff could occasionally or frequently lift or carry
less than ten pounds, stand or walk for less than two hours, and
sit for about four hours in a workday with limited pushing or
pulling with his arms or legs and the need for a sit/stand option
(Tr. 299-300).  Dr. Jain cited generalized osteoarthritis,
inflammatory arthritis, chondromalacia, spondylosis, manic

9

depression, peripheral neuropathy, and congestive heart failure (Tr. 300). He indicated that plaintiff's pain was constantly severe enough to interfere with attention and concentration and that he was incapable of even low stress jobs. Plaintiff would need unscheduled breaks every ten minutes and should elevate his legs with prolonged sitting. Dr. Jain further state that plaintiff was likely to be absent more than four times a month due to his impairments (Tr. 300). He could do only limited manipulative activities due to peripheral neuropathy and inflammatory arthritis (Tr. 301). Dr. Jain stated that plaintiff should avoid even moderate exposure to all of the environmental factors (Tr. 301).

Dr. Jain continued to treat plaintiff for problems including back pain, neck pain, chest pain, and palpitations (Tr. 482-484, 487-492, 494-498, 526-530). X-rays of the lower spine in February 2004 showed lipping at multiple levels, particularly at L3, L4, and L5 anteriorly (Tr. 537). A transthoracic echocardiogram was normal (Tr. 480). Plaintiff developed chest pain during nuclear stress testing (Tr. 479). There were ischemic ST-segment changes during the Dobutamine study; the gated ejection fraction was mildly reduced; and a predominantly fixed distal anteroseptal defect was present, possibly related to CAD (Tr. 485). Dr. Joel Tanedo, a cardiologist, evaluated plaintiff in March 2004 and opined that his chest pain was

10

probably noncardiac in origin (Tr. 540-542). Protonix did not
relieve Plaintiff's chest pain, and Dr. Jain prescribed
Alprazolam, Albuterol Sulfate, and a nebulizer (Tr. 526-527).

At the hearing in March 2004, plaintiff testified that
his hands had improved very little since surgery (Tr. 576). His
hands ached constantly, especially when he tried to grip
something. He often was dropping things (Tr. 576).

Plaintiff stated that both of his knees hurt (Tr. 576).
His knees were weak, he fell frequently, and he used a cane to
try to prevent falls (Tr. 578-579). Dr. Thompson recommended
total knee replacements (Tr. 576). Despite medications,
plaintiff continued to have severe pain (level eight on a ten-
point scale) (Tr. 580). His medications tended to make him dizzy
(Tr. 581).

Plaintiff also testified about recent problems with
breathing (Tr. 581). He took medications and used inhalers (Tr.
582). He had cut his smoking habit down to a half pack a day.
Plaintiff experienced shortness of breath with walking. When he
walked 50 feet from the garage to the porch, he would become
short of breath (Tr. 582).

Before he developed breathing problems, plaintiff's
ability to walk was limited due to his knee problems (Tr. 582).
He estimated that he could walk five or ten minutes at a time and
a total of one hour to one hour and a half a day (Tr. 582). He

Case 2:05-cv-00023   Document 19   Filed 02/23/06   Page 11 of 25 PageID #: 34

could stand in one place for 10 or 15 minutes (Tr. 583).
Prolonged sitting caused pain in his legs, hips, and back and
swelling and tingling in his feet (Tr. 583).

Plaintiff testified to a limited range of activities.
He would drop dishes when he tried to wash them (Tr. 583).
Mopping caused back pain.  He did not do laundry (Tr. 583).  As
to yard work, plaintiff stated that he could do 10 or 15 minutes
on a riding mower (Tr. 584).  The vibration would bother him.
Plaintiff would drive short distances — for example, to his
children's school (a ten-minute drive) (Tr. 584).

On a typical day, plaintiff would sit while his wife
and kids got ready for school (Tr. 586).  He sometimes went with
his wife to take the kids to school.  He would alternate sitting
and lying down.  He might be able to do an activity for 20
minutes at a time, but would then have to lie down for an hour or
two (Tr. 586).  Plaintiff would lie down for a couple of hours a
day (Tr. 583).  He stayed at home most of the time (Tr. 587).

Plaintiff had difficulty sleeping because of constant
pain; it was hard to find a comfortable position (Tr. 585).

Plaintiff had given up most of his activities as a
volunteer fireman (Tr. 585).  While he had once been to all of
the meetings, he had only been to two or three meetings over the
past year.

The vocational expert testified that the limitations

12

described by Dr. Jain would not allow for any work (Tr. 591).  He further testified that pain described as moderately severe to severe on a constant basis would not allow a person to sustain work (Tr. 593-594).

### III.  CONCLUSIONS OF LAW

#### A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Secretary</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Secretary</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Commissioner</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Commissioner</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.

13

Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6ᵗʰ Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  Hurst v. Secretary, 753 F.2d 517, 519 (6ᵗʰ Cir. 1985).

B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

14

such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. <u>See</u> <u>Varley v. Secretary</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of

15

all the claimant's impairments, mental and physical, exertional
and nonexertional, severe and nonsevere. See 42 U.S.C. §
423(d)(2)(B).

C. Plaintiff's Statement of Errors

Plaintiff alleges two errors in the ALJ's decision: (1)
that he failed to give Dr. Jain's opinions and assessment the
weight they were due pursuant to his status as a treating
physician, and (2) that he failed to analyze the alleged
subjective complaints of pain under the standard prescribed by
regulation and Sixth Circuit caselaw. While the undersigned
would not characterize the ALJ's treatment of either issue as
erroneous, it is concluded that his findings on both issues lack
substantial evidentiary support for part of the period under
review, and that remand for further factfinding is therefore
necessary.

The ALJ wrote a lengthy opinion in this case, much of
which is devoted to the medical evidence of plaintiff's knee and
carpal tunnel-related impairments. As reflected in the summary
of medical evidence above, plaintiff has had four knee surgeries
(two on the left and two on the right), and has been told that he
will eventually need total knee replacements, though his doctors
intend to forestall those replacements as long as possible due to
plaintiff's young age. Plaintiff has also has a long history of
symptoms in his arms and hands, including pain, numbness,

16

tingling, and weakness, and has undergone carpal tunnel release surgeries on both wrists. While the medical evidence reflects a difference of opinion as to whether plaintiff in fact suffers from carpal tunnel syndrome versus an overuse syndrome, it appears that the release surgeries did largely relieve his numbness. Most of the medical record (and the ALJ's discussion of same) bears on these two areas of impairment, with the treatment records from plaintiff's first internist, Dr. Jenkins, and the orthopedists he consulted detailing his surgeries, symptoms and prescribed treatments from 1998 through 2002.

However, plaintiff was insured for DIB purposes through the date of the ALJ's decision on August 24, 2004, and of course his SSI claim pertains to that time period and beyond. While the ALJ's discussion of plaintiff's impairments and symptoms prior to the year 2003 is likely sufficient to withstand judicial scrutiny, as much if not more of the time period which the ALJ reviewed is described in the late 2002-2003 medical records of Dr. Jenkins and the 2003-2004 records of plaintiff's subsequent primary care physician, Dr. Jain. However, the ALJ's discussion of the medical evidence seems to be two-tiered, dealing first with the evidence prior to November 2002 (Tr. 22-28), then explaining his RFC and credibility determinations (Tr. 28-31), and then analyzing the evidence from Dr. Jain in 2003-2004 (Tr. 31-32), which is contrary to those determinations. In the

17

undersigned's view, this delineation has a significant impact on both the deference due Dr. Jain's opinion and the evaluation of plaintiff's subjective complaints.

Taking the latter issue first, the Sixth Circuit's standard for reviewing determinations as to the credibility of subjective pain complaints was enunciated in <u>Duncan v. Sec'y of Health & Human Servs.</u>, 801 F.2d 847, 853 (6th Cir. 1986), and requires the following:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

At all points under review, it is clear that plaintiff suffered from multiple underlying, objectively verifiable medical conditions. Indeed, the ALJ concluded that plaintiff's severe impairments "can reasonably be expected to produce significant pain/discomfort and exertional and non-exertional limitations in the claimant's ability to perform basic work activities" (Tr. 18-19). The medical evidence is elsewhere found to support a reasonable expectation of "mild-to-moderate" and "moderate" pain and discomfort (Tr. 29,30). Of course, in gauging the severity of plaintiff's medical conditions for purposes of confirming the level of pain reasonably expected to result from them, the ALJ must examine not only the objective medical evidence, but all

pertinent evidence of record, including reports of physicians, daily activities, type and dosage of pain medication taken, side effects from medications, etc. 20 C.F.R. § 404.1529(b), (c); Social Security Ruling 96-7p, 61 Fed. Reg. 34483, at *34484-34485; e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); Felisky v. Bowen, 35 F.3d 1027, 1037-41 (6th Cir. 1994).

It is the above-cited authorities which plaintiff contends the ALJ has run afoul of, specifically by his finding that "[t]he claimant's statements and testimony are credible only to the extent they are supported by the objective medical reports of his treating/examining physicians, who have supported their opinions with objective medical evidence (i.e., clinical notes, laboratory studies, functional capacity assessments, range of motion studies, etc.), and the residual functional capacity assessment in this case." (Tr. 30). It is clear from this statement and others in his decision that the ALJ views the medical evidence (both in the form of clinical/radiographic test results and the lack of opinions from treating sources that plaintiff is under disabling restrictions) as the chief detractor from plaintiff's credibility. With respect to the period prior to 2003, the undersigned concludes that the reliance placed on the medical evidence is substantially justified and the consideration given other factors (i.e., medications taken, side

Case 2:05-cv-00023   Document 19   Filed 02/23/06   Page 19 of 25 PageID #: 42

effects, and activities of daily living -- Tr. 20-21) is
sufficient, particularly given the fact that the most substantial
statements given by plaintiff or his mother to the agency were
submitted within one or two months after his second right knee
surgery (Tr. 19-21, 83-92, 109-116), a period when limitations
would be expected to be increased but perhaps not expected to
persist.

However, in August 2002, when plaintiff filed a
statement in support of his request for hearing, plaintiff
reported that his condition had changed since he last contacted
the agency on March 7, 2002, in that the pressure and pain in his
neck and spine had worsened (Tr. 125). The ALJ made note of this
report and the medications which were prescribed at the time by
Dr. Jenkins (Tr. 20), but did not particularly discuss
plaintiff's cervical spine condition other than to find his neck
pain and spondylosis "nonsevere" (Tr. 22),[3] presumably based on a
March 30, 1999 report on magnetic resonance imaging (MRI) (Tr.
268-69). This MRI of the cervical spine "revealed mild
spondylosis with mild left neuroforaminal narrowing at the C4-5
level and mild right neuroforaminal narrowing at the C5-6 level,
both related to mild disk bulge and accompanying osteophyte."
(Tr. 26). The neurosurgeon who was consulted for this purpose

_____

[3] But see Tr. 31, where the ALJ found that "[b]ecause of significant
pain/discomfort in his neck/shoulders, he is unable to use his upper
extremities for continuous or repetitive activities."

20

found that the MRI results did not explain the level of pain complained of (Tr. 265).

However, it is clear that plaintiff has complained of tenderness in the neck/trapezius/upper back region since the date of his injury at work in January 1999 (Tr. 267), when the neurosurgeon said "he probably stretched the nerve" (Tr. 265). On April 24, 2002, in response to continued complaints of pain in plaintiff's knees and neck, Dr. Jenkins referred him to a pain clinic (Tr. 356-57). On July 18, 2002, when plaintiff continued to complain of neck and back pain, Dr. Jenkins maintained medical treatment with a high dose of aspirin, increased his dosage of Neurontin (for nerve-related pain)[4] to 800 milligrams, and added nortriptyline hydrochloride (for "chronic, severe pain")[5]. (Tr. 279-280). This pain continued to be noted by Dr. Jenkins late into 2002 -- with "diminished active ROM [range of motion] and point tenderness" on October 29, 2002 (Tr. 276) -- and into 2003, when Dr. Jenkins noted tenderness to light touch and resulting headaches, and added a prescription for Darvocet-N 100 (a mild narcotic prescribed for the relief of mild to moderate pain)[6] to plaintiff's mix of pain medications (Tr. 292-97). Plaintiff last saw Dr. Jenkins on June 20, 2003.

---

[4] http://www.healthsquare.com/newrx/NEU1289.HTM

[5] <u>Dorland's Illustrated Medical Dictionary</u> at 1151 (28th ed. 1994).

[6] http://www.healthsquare.com/newrx/DAR1115.HTM

Plaintiff appears to have first seen Dr. Jain on September 19, 2003, when plaintiff arrived seeking medication refills (Tr. 346-47). While Dr. Jain's treatment notes from 2003 and 2004 leave something to be desired in terms of specificity, they consistently note the presence of neck pain and pain in the upper and lower back during 2003 (Tr. 302-347, 501-03), and consistently note back pain in 2004 (Tr. 487-500), with diagnoses of cervical disc disorder with myelopathy and lumbar disc disorder with myelopathy (Tr. 498). Also, as the ALJ notes, these records consistently note reduced strength in the flexor and extensor muscles of both hands (e.g., Tr. 488). These records have also consistently included the examiner's note of a limping, slow, cautious, stiff, and unsteady gait, and include several references to muscle spasms, although it is unclear which muscle group(s) the spasm was reported in (Tr. 329, 344, 346). On September 19, 2003, Dr. Jain prescribed Parafon Forte DSC, a medication for the relief of discomfort associated with severe, painful muscle spasms,[7] and continued that prescription through the course of his treatment of plaintiff. In 2004, in response to plaintiff's cervical disc disorder, Dr. Jain ordered and continued the medication Avinza, a narcotic (morphine-based), extended release medication "for the relief of moderate to severe pain requiring continuous, around-the-clock opioid therapy for an

_____

[7] http://www.healthsquare.com/newrx/PAR1317.HTM

22

extended period of time."[8] (Tr. 498, 491).  Finally, a cervical spine MRI ordered by Dr. Jain in April 2004 due to "severe increased neck pain" revealed "[s]traightening of the normal cervical lordosis which is usually secondary to acute muscle spasm" (Tr. 545).

In view of the evidence discussed above, and the ALJ's failure to discuss it in his opinion, the undersigned concludes that the evidence does not substantially support the ALJ's finding on the credibility of plaintiff's pain complaints.  In addition, muscle spasm, loss of lordosis, decreased strength, and abnormal gait are among the indicators of severe pain which may be sufficient to objectively establish the level of pain, irrespective of other factors which might detract from plaintiff's overall credibility.  Cf. Jones v. Sec'y of Health & Human Svcs., 945 F.2d 1365, 1369-70 (6th Cir. 1991).  This issue deserves further administrative attention.

Likewise, while the medical record contains medical evidence which is inconsistent with the restrictive RFC assessment given by Dr. Jain in December 2003 (Tr. 299-301), that evidence is not contemporaneous with Dr. Jain's treatment of plaintiff, but in most cases precedes that period of treatment by at least one year.  Indeed, the RFC assessment which the ALJ appears to have worked from in making his own RFC finding was the

---

[8] http://www.fda.gov/medwatch/safety/2005/avinza_PI.pdf

23

February 2002 assessment of Dr. Burr, the non-examining state agency physician.  Conversely, the 2002-2003 notes of plaintiff's prior treating internist, Dr. Jenkins, reflect increases in the number and dosage of plaintiff's pain medications.  Since the RFC assessment of Dr. Jain thus appears to be inconsistent with some prior items of medical evidence, but uncontroverted by any contemporaneous medical source, it would appear that further consideration of an expanded medical record (including a consultative examination at government expense, if the ALJ deems it necessary) is warranted to fully illuminate the issue of what deference is owed to this treating physician's opinion.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings, to include updating the medical record and rehearing.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this

Case 2:05-cv-00023   Document 19   Filed 02/23/06   Page 24 of 25 PageID #: 47

Report and Recommendation can constitute a waiver of further

appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140

(1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en

banc).

   **ENTERED** this 23rd day of February, 2006.


             /s/ Joe B. Brown
             JOE B. BROWN
             United States Magistrate Judge